Filed 10/16/15  P. v. Edwards CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B254610 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA060075) |
| v. | |
| RHETT ERIC EDWARDS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Carlos A. Chung, Judge.  Affirmed.

Mark J. Shusted, under appointment by the Court of Appeal for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Marc A. Kohm and Gary A. Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Rhett Eric Edwards appeals his convictions for possession for sale of, and transportation of, a controlled substance, methamphetamine, and false personation. He contends the trial court erred by making improper comments during voir dire, and by denying his *Pitchess* motion[1] in part without conducting an in camera review of one officer's records. He also requests that we review the sealed record of the trial court's *Pitchess* review of the records of another officer to determine whether the court abused its discretion by failing to order sufficient disclosure. (*People v. Mooc* (2001) 26 Cal.4th 1216.) We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts*

a. *People's evidence*

On June 29, 2013, at approximately 10:00 p.m., Los Angeles County Sheriff's Deputies Curtis Foster and Obidio Alanis were on patrol in Lancaster. They observed a car exit a mobile home park. One of its headlights was out, and its registration was expired. The deputies made a traffic stop. A woman was driving the car; Edwards was the front seat passenger; and a third person was seated in the back seat. Edwards held a backpack or bag on his lap.

Alanis approached the driver's side of the car, and Foster approached the passenger side. As he did so, Foster smelled the odor of marijuana emanating from the car. He asked Edwards whether he had any marijuana. Edwards stated he had smoked some earlier that day. Foster had Edwards exit the car and conducted a pat search to locate the source of the marijuana odor. Foster felt a hard bulge near Edwards's groin area, and asked what it was. Edwards stated it was "meth." Foster retrieved the object, which proved to be 7.48 grams of a substance containing methamphetamine, wrapped in plastic. Foster read Edwards his *Miranda* rights,[2] and Edwards waived them. Edwards

---

[1] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

[2] *Miranda v. Arizona* (1966) 384 U.S. 436.

then admitted he was selling "a little bit" of methamphetamine to make some extra money.

Foster found $260 in cash in Edwards's pocket, consisting of twelve $20 bills, one $10 bill, and two $5 bills. Inside the backpack that had been on Edwards's lap, Foster found a digital scale and a marijuana cigarette. Foster did not find any paraphernalia of the sort typically used to consume methamphetamine.

Foster also found a cellular telephone in Edwards's pocket, and examined text messages contained therein. One read, " 'I'm confused. Am I giving you 70 for the T and for what I owe you or just 70 because now Denise wants something to eat[?]' " Another said, " 'Hey, Eric,' " (appellant's name), " 'can you do a 60 and I'll pay you the whole thing on Tuesday[?]' " Foster testified that "T" is short for "teener," or 1/16th of an ounce of methamphetamine. Drug dealers commonly "front" drugs to their clients for later payment. In drug transactions, quantities of drugs are typically referenced by their cost. Foster opined that both messages indicated drug transactions. Another message read, " 'I still want that bit. I couldn't stop in Pdale before I had to go home. Can you meet me in Lancast[er?]' "

Based on Foster's training and experience, he opined that a typical addict or user would not possess "anything close" to the amount of methamphetamine found in Edwards's pants. Many drug transactions are conducted in $20 increments. Foster believed Edwards was using the scale for narcotics sales. When given a hypothetical that tracked the evidence adduced at trial, Foster opined that the methamphetamine was possessed with the intent to sell it. His opinion was based on the totality of the circumstances, including the quantity of methamphetamine discovered, the presence of the cash and the scale, the text messages, Edwards's statements, and the absence of any paraphernalia associated with methamphetamine use.

When arrested and booked, Edwards gave a false name, that of his ex-girlfriend's current boyfriend. The falsification was discovered when Edwards's fingerprints were processed at booking. Deputy Alanis spoke to Edwards at the jail, reminded him of the

3

*Miranda* admonitions he had been given, and informed him that his fingerprints did not match the name he had provided. Edwards apologized and admitted he had lied. He explained he had been afraid to give his real name because he had outstanding warrants. He then provided his true name and date of birth.

b. *Defense evidence*

Edwards's mother testified that Edwards lived with her, and did not pay rent. She paid him to be her caretaker and housekeeper. He also worked doing odd jobs for people.

2. *Procedure*

Trial was by jury. Edwards was convicted of transportation of a controlled substance, methamphetamine (Health & Saf. Code, § 11379, subd. (a)); possession for sale of a controlled substance, methamphetamine (Health & Saf. Code, § 11378); and false personation (Pen. Code, § 529, subd. (a)(3)). Edwards admitted suffering one prior drug-related conviction (Health & Saf. Code, § 11370.2, subd. (c)) and serving 10 prior prison terms within the meaning of Penal Code section 667.5, subdivision (b). The trial court sentenced Edwards to 14 years in county jail, consisting of the upper term of four years on the transportation offense, plus a three-year Health and Safety Code section 11370.2, subdivision (c) enhancement, and seven one-year prior prison term enhancements (Pen. Code, § 667.5, subd. (b)). The court imposed a concurrent three-year term on count 3, false personation. Sentence on count 2, possession of methamphetamine for sale, was stayed pursuant to Penal Code section 654. The court imposed a restitution fine, a court operations assessment, a criminal conviction assessment, a laboratory analysis fee, a penalty assessment, and a state surcharge. Edwards appeals.

DISCUSSION

1. *Voir dire*

Edwards contends that certain comments by the trial court during voir dire encouraged jurors to violate their oaths to tell the truth, either to avoid jury service or

conceal bias. He urges that the court's conduct violated his rights to due process and a fair trial, and amounted to structural error, requiring reversal. We disagree.

a. *Additional facts*

After the prospective jurors were sworn, the trial court explained the presumption of innocence, the reasonable doubt standard, the People's burden of proof, the requirement that jurors be fair, and various other matters related to the conduct of the trial.

The court then turned to the issue of jurors who attempt to escape jury duty. It explained: "I get a number of questions whenever people find out what I do for a living. The first question is usually, hey, I got this summons in the mail for jury duty. Do I have to go. And the answer is yes. . . . [¶] When I tell them that, they say, okay, if I have to go, how do I get off of jury duty. And it's very easy. If you don't know, I will tell you now how to get off of jury duty. Okay? Just take an extreme position and you will get kicked off. And that can take any number of forms. Judge, I think all police officers are liars. And if someone comes in in uniform, I will not even listen to them. They are a liar before they have even opened their mouth. And you will get kicked off. [¶] Or, Judge, I believe all police officers tell the truth no matter what. If an officer – if someone comes in and they are an officer and they are in uniform, they could tell me the earth is flat and that would be good enough for me. If he says it or if she says it and they are in uniform, that's good enough for me, and you will get kicked off this jury. [¶] And any variation of that. I will vote guilty no matter what, I will vote not guilty no matter what, and you will get kicked off this jury. [¶] However, before you take that position, could I maybe plant a couple of seeds of thought into your mind. One, I don't know if you realized what you did when you came into the courtroom but you all stood and under penalty of perjury you swore to tell the truth. What does that mean? It means that you are under penalty of perjury. It means that if you lie during this process, you actually could be prosecuted for committing a crime. You will hear on the news every now and then, and it tends to make national news, of a juror or jurors being charged with a crime because they lie during this

process. [¶] This process is called voir dire. It's French for truth telling or telling the truth. And so if you lie during this process, you can be prosecuted."

The court then referenced an instance occurring several months earlier in which the court and the attorneys caught a juror in "a bold-faced lie as he was trying to get off of jury duty," raising the issue of whether the court had to report the juror to "the authorities . . . for criminal prosecution." The court stated, "So it happens. It happens regularly." The court cautioned: "Now, I'm old fashioned. I tend to think honesty and integrity still means something but it means something doubly so if you are under penalty of perjury."

The judge then briefly recounted how his life experiences had led him to appreciate the sacrifices made by American military personnel and convinced him that the United States, while not perfect, was the best country in the world: "And the reason for that is because of the freedoms we enjoy. The right to a jury trial is unique in the world." The judge next described how, when a foreign delegation had recently visited his courtroom, he had explained the value of jury trials: "I told them it keeps the system pure. It's a public setting. Everybody hears what's going on. We get 12 people from the community and all 12 have to agree unanimously one way or the other before we take action. We want our citizens whom we trust to decide this process. . . . We want 12 citizens from our country to serve this role. It keeps the system pure."

The court continued: "When people come into the courtroom and take these extreme positions to get off of jury duty, I think what it does is it belittles the process and it belittles the freedoms we enjoy here in America. [¶] So I tell you that because in every case just about I have jurors who take extreme positions." The court then gave examples of instances in which prospective jurors had been "kicked off of jury duty" for expressing extreme views. One such juror had averred that all police officers were liars, and he would not consider their testimony. Another claimed he could read people's minds based on their body language. A third claimed to believe that children never lie. A student had admitted that she would vote guilty, even if she believed the defendant was not guilty, in

6

order to avoid missing class, a position that the court found shocking. Another stated he would "vote guilty if that is what will get me out of here." The court admonished: "I wish it didn't happen but it happens in enough cases . . . ." The court stated, "Hopefully you won't do this and hopefully it will be an enjoyable process for you."

The court then conducted the initial voir dire of the jury panel, using standard questions contained on the jury questionnaire. All jurors indicated they could "be fair."

Prospective Juror 11 stated that he had had a negative experience with the police, in that he was "[j]ust pulled over and cited constantly and sometimes I really don't even know why." He had received tickets, and his brothers had been convicted of "[d]rug and criminal offenses." Prospective Juror 11 did not feel he had been treated fairly by the court system and "didn't even get to speak my side." He had also been the victim of attempted murder "several times." Nonetheless, when the court asked whether he could be fair, he replied affirmatively.

When defense counsel subsequently questioned him, Prospective Juror 11 stated, "I just believe everybody is innocent" and "I can't judge anybody." He later stated he would be unable to reach a decision, explaining: "I have been to court. Like I said, I have been a victim. I have been shot in the face. And I can't, you know, say that person is guilty. I cannot – I don't know. I just can't hold something against somebody." The following colloquy transpired:

"The Court: All right, Juror number 11, you have said that to you everyone is innocent. And that's what we want. We want you to assume that everyone is innocent. As the defendant sits here, he is innocent. And it doesn't matter who we sit in that chair. The system we have is that we presume that they are innocent. Are you okay with that?

"Prospective Juror No. 11: Yeah.

"The Court: Okay. Let's say you listen to all the evidence and at some point you come to the conclusion that a defendant is guilty. Will you vote guilty in that situation?

"Prospective Juror No. 11: I can't do that.

"The Court: Why not?

7

"Prospective Juror No. 11:  Because I don't feel that I'm – I can't judge anybody for that.  I can't determine if they are guilty or not.  I just can't.

"The Court:  Let's say I have a case where someone steals a $100 bill from a store cash register.  All right?  There is video.  The video shows someone stealing the $100 bill.  They have a close-up of the person and the person that you see in the video matches the person in court.  Let's say there is a taped confession from the person saying I stole the $100.  And let's say you have 50 people that come in and they all say I saw that person steal the money. . . .  And you believe all of them and you believe the defendant is guilty.  Will you vote guilty?

"Prospective Juror No. 11:  We have to go back.  Why did he do it.

"The Court:  I don't know.  But you believe he is guilty.  Will you vote guilty?

"Prospective Juror No. 11:  I don't know because I don't know why he did it.

"The Court:  That's how it's done, folks.  In your mind everyone is innocent and you will never vote guilty; is that right?

"Prospective Juror No. 11:  Yeah.  I don't know why – obviously there is a reason.

"The Court:  You get off the jury.  [¶]  That is how it's done, folks."

The court subsequently excused Prospective Juror 11 for cause.  Out of the presence of the jury, the court explained that off the record, the People had stated they would challenge Prospective Juror 11 for cause and the court "tended to agree."  The court invited defense counsel to "memorialize any objection" to the prospective juror's removal.  Defense counsel stated, "Well, Your Honor, he obviously had some strong feelings so I will submit on that."  The court replied, "I agree.  He had very strong feelings and so that's why I excused him for cause."

b. *Applicable legal principles*

Voir dire plays " 'a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored ' " (*People v. Debose* (2014) 59 Cal.4th 177, 194; *People v. Chapman* (1993) 15 Cal.App.4th 136, 141.)  It protects a defendant's right to an impartial jury by " 'exposing possible biases, both known and

8

unknown, on the part of potential jurors.' " (*In re Boyette* (2013) 56 Cal.4th 866, 888; *People v. Wilson* (2008) 44 Cal.4th 758, 822-823.) The efficacy of voir dire depends upon prospective jurors answering truthfully when questioned. (*In re Boyette,* at pp. 888-889; *People v. Wilson,* at p. 822.)

Code of Civil Procedure section 223 provides that in a criminal case, the trial court conducts the initial examination of prospective jurors, and the examination "shall be conducted only in aid of the exercise of challenges for cause." Trial courts possess broad discretion over both the manner of conducting voir dire and decisions about prospective jurors' qualifications. (*People v. Whalen* (2013) 56 Cal.4th 1, 29-30.) "The exercise of discretion by trial judges in conducting voir dire is accorded considerable deference by appellate courts." (*People v. Lenix* (2008) 44 Cal.4th 602, 625, fn. 16; *People v. Mello* (2002) 97 Cal.App.4th 511, 516 (*Mello*).) An abuse of discretion will be found when "the questioning is not reasonably sufficient to test the jury for bias or partiality." (*People v. Cardenas* (1997) 53 Cal.App.4th 240, 247; *People v. Chapman, supra,* 15 Cal.App.4th at p. 141.) Pursuant to Code of Civil Procedure section 223, "The trial court's exercise of its discretion in the manner in which voir dire is conducted . . . shall not cause any conviction to be reversed unless the exercise of that discretion has resulted in a miscarriage of justice . . . ." When evaluating a trial court's remarks, we must consider the context in which they were made. (See *People v. Avila* (2009) 46 Cal.4th 680, 716.)

"The right to have a fair and impartial jury determine guilt or innocence is ' "one of the most sacred and important of the guaranties of the constitution. Where it has been infringed, no inquiry as to the sufficiency of the evidence to show guilt is indulged and a conviction by a jury so selected must be set aside." [Citations.]' [Citation.]" (*People v. Cardenas, supra,* 53 Cal.App.4th at p. 246.)

In *Mello,* the Third Appellate District held that a trial judge's instructions to prospective jurors "to lie about racial prejudice and make up reasons to avoid jury service" was structural error requiring reversal. (*People v. Abbaszadeh* (2003)

9

106 Cal.App.4th 642, 644 (*Abbaszadeh*); *Mello, supra,* 97 Cal.App.4th at p. 513.) There, the trial court told prospective jurors that if they harbored racial bias but were embarrassed to admit it during voir dire, they should lie and make up some other reason to "get excused" from the jury. (*Mello,* at p. 514.) This "astonishing" advice violated the defendant's federal and state constitutional rights to a fair and impartial jury and to due process. (*Id.* at pp. 515-516.) The instructions "irremediably tainted the trial by making it impossible for the parties to know whether a fair and impartial jury had been seated." (*Id.* at p. 517.) The advice to conceal and falsify relevant information potentially deprived the parties of the information necessary to make informed decisions. It also "infected the entire trial process with the unacceptable notion that lying under oath may be appropriate," which could have caused jurors to ignore the law and undercut their ability to evaluate the witnesses' testimony. (*Id.* at pp. 518-519.)

The Third Appellate District came to the same conclusion in a subsequent case, *People v. Abbaszadeh, supra,* 106 Cal.App.4th 642, in which the same trial judge made similar comments. Although the judge did not use the word "lie" in *Abbaszadeh,* he told jurors that he did not want bigots or racists sitting on the jury. He instructed that if prospective jurors harbored such feelings, they should " 'do whatever you have to do to get off the jury, even if, . . . you have to answer my questions in such a way that you get off in some other way, then do it.' " (*Id.* at pp. 646-647, italics omitted.)

c. *Forfeiture*

The People argue that Edwards has forfeited his challenge to the trial court's remarks because he failed to object to them below. "[M]ost errors in voir dire must be brought to the attention of the trial court or they will be deemed waived on appeal." (*Abbaszadeh, supra,* 106 Cal.App.4th at p. 648; *People v. Abel* (2012) 53 Cal.4th 891, 914 ["a defendant who fails to make a timely objection to the claimed [judicial] misconduct forfeits the claim unless it appears an objection or admonition could not have cured any resulting prejudice or that objecting would have been futile"].)

10

Edwards relies on *People v. Abbaszadeh, supra,* 106 Cal.App.4th 642, for the opposite proposition. In *Abbaszadeh,* the appellate court concluded the general rule did not result in forfeiture for three reasons. First, an objection would have been fruitless. The same trial judge had made similar inappropriate remarks in the *Mello* case, and had there rejected defense counsel's repeated attempts to challenge the remarks, instead opining that his unique method of voir dire was the best way to ensure an impartial jury. (*Abbaszadeh,* at pp. 648-649.) Second, the prosecutor was at fault for failing to object to the court's "egregious and unlawful instruction," in derogation of his or her duties as a law enforcement official and an attorney. (*Id.* at p. 649.) Third, Penal Code section 1469 authorized the appellate court to review an instruction that affected the defendant's substantial rights, even in the absence of an objection. (*Id.* at p. 649.) Because the error was "so shocking, affecting the structural integrity of the trial" and impairing the integrity of the judiciary, the court exercised its discretion to reach the merits. (*Id.* at pp. 649-650; § 1469.)

None of the *Abbaszadeh* factors are present here. There is no showing an objection would have been futile. As we explain *post,* the trial court did not instruct jurors to lie or otherwise violate their oaths, and the prosecutor therefore was under no duty to object to an unlawful instruction. The court's comments were of an entirely different ilk than those in *Abbaszadeh* and *Mello,* and are neither shocking nor threatening to the integrity of the judicial system or the trial. Accordingly, we agree with the People that the contention has been forfeited.

d. *The trial court's remarks did not violate Edwards's fair trial or due process rights*

The claim fails on the merits in any event. Edwards suggests the court's remarks "in effect gave prospective jurors advance authorization to violate" their oaths and commit perjury. He complains that the court's advice on "how to avoid jury service" infected the entire trial with the unacceptable notion that lying under oath may be appropriate. (*Mello, supra,* 97 Cal.App.4th at p. 518.) We disagree. The court's remarks

11

here were unlike those in *Mello* and *Abbaszadeh.* There, the court encouraged and gave permission to prospective jurors to lie during voir dire. Here, the court's remarks were exactly the opposite: they were aimed at convincing prospective jurors to tell the truth. The court here not only encouraged prospective jurors to be honest, it advised them that lying during voir dire was a crime. It appealed to prospective jurors' senses of patriotism, integrity, and duty in exhorting them to fulfill their civic duty. The thrust of the court's remarks was to inspire jurors to willingly serve, and encourage them *not* to lie. Nothing about the court's comments telegraphed that lying under oath was acceptable.

Edwards also argues that the court's "roadmap" of how to avoid jury service, complete with examples, "could not help but encourage mendacity from a juror inclined to avoid service," especially given that there was no showing the persons in the examples had suffered adverse consequences. But the examples given were obviously not intended to encourage such behavior. Instead, it appears the court intended to curtail attempts to evade service by acknowledging an unfortunate reality, demonstrating its wrongfulness, and alerting jurors that it had experience with such ploys and would not be taken in. It may have been unwise for the court to offer such explicit examples of "extreme positions" that would "get you kicked off this jury," because this might have educated a prospective juror bent on avoiding service on how to effectively do so. But with one possible exception, the record conclusively demonstrates this did not occur. The prospective jurors did not express any extreme views; none appear to have attempted to avoid service; and all said they could be fair, even those who had suffered difficult circumstances related to the criminal justice system.

The one possible exception was Prospective Juror 11. But he initially affirmed that he could be fair, despite his negative experiences with the police and the court system. When questioned further about his inability to render judgment in a hypothetical case, he explained that he would not be able to do so because he did not know why the perpetrator committed the crime. When the trial court and parties subsequently discussed the jurors excused for cause, they appeared to accept that Prospective Juror 11's concerns

12

were genuine. Neither the prosecutor, defense counsel, nor the court suggested Prospective Juror 11 had been lying to avoid service. The prosecutor indicated an intent to challenge him for cause; defense counsel declined to object, observing that the prospective juror "obviously had some strong feelings"; and the trial court – which was in the best position to evaluate the prospective juror's sincerity -- concurred that it had excused him due to his "very strong feelings." (See *People v. Duff* (2014) 58 Cal.4th 527, 541 [trial court is in a " ' "position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors" ' "].) The trial court's comment – "That's how it's done, folks" – was unwise and suggests the court may have, at that moment, suspected Prospective Juror 11 was attempting to exit the jury. But the court's subsequent comments, as well as those of defense counsel, belie this conclusion. In any event, in considering judicial misconduct, " ' "[o]ur role . . . is not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid. Rather, we must determine whether the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial." ' [Citation.]" (*People v. Abel, supra,* 53 Cal.4th at p. 914.) We discern no such prejudice here. (See generally *People v. Avila, supra,* 46 Cal.4th at p. 717 [trial court's comment, after excusing several full-time students for cause, " 'Now you see why democracy is so hard to preserve,' " was perhaps intemperate; however, the comment demonstrated frustration with the inherent difficulty of finding prospective jurors and a desire to avoid false hardships, rather than bias, and did not rise to the level of judicial misconduct].)

Edwards also complains that the trial court's remarks suggested to secretly biased prospective jurors that they could remain in the venire by simply pretending to be fair. Edwards does not explain how the court's remarks might have given such an impression, however, and we see no possibility they could have been interpreted as he suggests.

Next, Edwards suggests that the trial court erred by deviating from the questions contained in the California Standards of Judicial Administration, section 4.30

("Examination of prospective jurors in criminal cases"). He points out that in *People v. Holt* (1997) 15 Cal.4th 619, 661, our Supreme Court stated that "[t]rial court judges should closely follow the language and formulae for voir dire recommended by the Judicial Council in the Standards to ensure that all appropriate areas of inquiry are covered in an appropriate manner." (*Ibid.*; *Mello, supra,* 97 Cal.App.4th at p. 516.) But section 4.30 of the Standards of Judicial Administration does not strictly limit a trial court to the questions contained therein; it states that the "trial judge's examination of prospective jurors in criminal cases should include the areas of inquiry listed below *and any other matters affecting their qualifications to serve as jurors in the case.*" (*Id.,* subd. (b), italics added.) "Trial courts possess broad discretion over . . . the manner of conducting voir dire . . . . "[T]he conduct of voir dire is an art, not a science," so " '[t]here is no single way to voir dire a juror.' " [Citation.]' [Citation.] ' "The Constitution . . . does not dictate a catechism for voir dire, but only that the defendant be afforded an impartial jury." ' [Citation.]" (*People v. Whalen, supra,* 56 Cal.4th at pp. 29-30.)

We are not persuaded that the court's comments frustrated the primary intent of voir dire -- ferreting out bias and prejudice -- as Edwards suggests. Unlike in *Mello,* the trial court here did not suggest prospective jurors should hide their biases or prejudices. Prospective jurors in the instant matter completed juror questionnaires that were referenced during voir dire (see Cal. Stds. Jud. Admin., § 4.30, subd. (b)). While the record does not contain the questionnaires, the questions posed by the court generally tracked those listed in section 4.30 and covered the areas of inquiry listed therein. Both defense counsel and the prosecutor were afforded the opportunity to inquire further and probe for possible hidden bias. (See *People v. Holt, supra,* 15 Cal.4th at p. 661.) After reviewing the entire voir dire of all prospective jurors, we are satisfied the inquiry was adequate. (*Ibid.*) In sum, the record reveals neither a violation of Edwards's constitutional rights nor a miscarriage of justice.

14

## 2. *Pitchess*

Edwards contends the trial court erred by limiting its in camera review to Deputy Alanis's records, on the theory that Alanis, rather than Foster, authored the police report. Edwards also requests that this court review the sealed record of the trial court's in camera *Pitchess* examination of Alanis's records.

### a. *Additional facts*

Prior to trial, Edwards filed a *Pitchess* motion seeking personnel records of Deputies Alanis and Foster. The motion sought information regarding complaints made against the deputies related to fabrication of charges, evidence, reasonable suspicion or probable cause; illegal search or seizure; perjury; dishonesty; the preparation of false police or other internal reports; and "any other evidence of misconduct amounting to moral turpitude . . . ."[3]

The police report, which was authored by Deputy Alanis, was attached to the motion and summarized in defense counsel's declaration. It stated essentially the same information as that to which the deputies testified at trial. Defense counsel's declaration described an alternative factual scenario, as follows. "Based upon information and belief, Mr. Edwards was seated in the front passenger seat on his way to Walmart with friends when the traffic stop occurred. Deputy Foster immediately pulled him out of the car and asked him if he had any marijuana, to which he replied that he had smoked some earlier. Deputy Foster then searched him and found the methamphetamine. Neither Deputy Foster nor Deputy Alanis ever read him his *Miranda* rights. . . . Mr. Edwards never admitted to selling methamphetamine and only indicate[d] to Deputy Foster that he possessed the methamphetamine for personal use. Mr. Edwards did have a bag in his possession when contacted by Deputy Foster but it did not contain a digital scale. Rather, the digital scale was taken from a backpack found elsewhere in the vehicle which did not

---

[3] Edwards's motion also sought information discoverable pursuant to *Brady v. Maryland* (1963) 373 U.S. 83. On appeal, he does not contend any *Brady* material was withheld.

15

belong to" Edwards. Defense counsel explained that the records sought would be used to locate witnesses who would testify that each officer had "a character trait, habit, and custom of engaging in misconduct of the type alleged in this case," and that such evidence would be admissible and relevant to show the officers were untruthful here.

The County of Los Angeles opposed the motion on behalf of the Los Angeles County Sheriff's Department (the Department) on various grounds, including that Edwards had failed to establish good cause for the in camera review of either officer's records.

At the hearing on the motion, counsel for the Department argued that the defense had shown good cause for the disclosure of Foster's, but not Alanis's, records, because Foster allegedly gave the *Miranda* admonitions, the primary fact disputed by Edwards. The trial court found the opposite: the defense had established good cause for an in camera review of Alanis's records for complaints related to dishonesty, but had failed to establish good cause as to Foster because Foster was not the author of the police report. Defense counsel argued that Alanis "would have been relying upon things" that Foster told him when preparing the report. The trial court disagreed, explaining: "The only good cause is as to Alanis because he authored the report. The assertion would be that Foster never *Mirandized* [Edwards]. Alanis fabricated that and put it in his report. Foster is in no way at any point making any affirmative statements at this point. It's only Alanis who is making the affirmative statements. Unless Foster authored a report I don't know about."

The trial court then conducted an in camera review of Alanis's records.

On October 31, 2013, Edwards moved to suppress the physical evidence gathered during the traffic stop, as well as his statements to the deputies, on the ground there was neither probable cause nor consent for the detention and search. After a hearing at which Foster was the sole witness, the trial court denied the suppression motion.

16

b. *Relevant legal principles*

On a showing of good cause, a criminal defendant is entitled to discovery of relevant documents or information in the confidential personnel records of a peace officer who is accused of misconduct against him. (*People v. Gaines* (2009) 46 Cal.4th 172, 179; *People v. Samuels* (2005) 36 Cal.4th 96, 109.) "To initiate discovery, the defendant must file a motion supported by affidavits showing 'good cause for the discovery,' first by demonstrating the materiality of the information to the pending litigation, and second by 'stating upon reasonable belief' that the police agency has the records or information at issue. [Citation.]" (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1019 (*Warrick*)*; Sisson v. Superior Court* (2013) 216 Cal.App.4th 24, 33-34; *People v. Moreno* (2011) 192 Cal.App.4th 692, 701.) If a defendant shows good cause, the trial court examines the material sought in camera to determine whether disclosure should be made and discloses "only that information falling within the statutorily defined standards of relevance." (*Warrick*, at p. 1019; *Moreno*, at p. 701.)

"There is a 'relatively low threshold' for establishing the good cause necessary to compel in camera review by the court. [Citations.]" (*People v. Thompson* (2006) 141 Cal.App.4th 1312, 1316; *Warrick, supra*, 35 Cal.4th at p. 1019.) Counsel's declaration must describe a specific and plausible factual scenario that would support a defense claim of officer misconduct, propose a defense to the pending charges, and articulate how the discovery sought might be admissible or lead to relevant evidence. (*Warrick*, at p. 1024; *Garcia v. Superior Court* (2007) 42 Cal.4th 63, 71; *Thompson,* at p. 1316.) "A scenario sufficient to establish a plausible factual foundation 'is one that might or could have occurred. Such a scenario is plausible because it presents an assertion of specific police misconduct that is both internally consistent and supports the defense proposed to the charges.' [Citation.]" (*Thompson*, at p. 1316, italics omitted; *Warrick*, at p. 1026.) Depending on the facts of the case, "the denial of facts described in the police report may establish a plausible factual foundation." (*Thompson*, at p. 1316; *Warrick*, at pp. 1024-1025.) A defendant need not establish that it is reasonably probable

17

his version of events actually occurred, provide corroborating evidence, show that his story is persuasive or credible, or establish a motive for the officer's alleged misconduct. (*Warrick*, at pp. 1025-1026; *Thompson*, at pp. 1316-1317.) Discovery is limited to instances of officer misconduct related to the misconduct asserted by the defendant. (*Warrick*, at p. 1021; *California Highway Patrol v. Superior Court* (2000) 84 Cal.App.4th 1010, 1021; *People v. Hill* (2005) 131 Cal.App.4th 1089, 1096, fn. 7, disapproved on other grounds in *People v. French* (2008) 43 Cal.4th 36, 48, fn. 5.)

Trial courts are vested with broad discretion when ruling on *Pitchess* motions (*Haggerty v. Superior Court* (2004) 117 Cal.App.4th 1079, 1086), and we review a trial court's ruling for abuse. (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 992; *Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1039.)

c. *Good cause for review of Deputy Foster's records*

(i) *Forfeiture*

Preliminarily, we address the People's contention that Edwards has forfeited his claim because he failed to "renew his *Pitchess* motion when the trial court became aware that Deputy Foster would testify." They contend that in light of the trial court's reasoning, an "opportunity existed for appellant to renew his *Pitchess* motion," and his failure to do so when the trial court learned Foster would testify, or at the time of trial, "should result in a forfeiture of the claim on appeal." This argument is meritless. If the trial court erred in the first instance, it is unclear why Edwards's failure to renew the motion resulted in forfeiture. The court's ruling was based on its concern that the statements in the police report could not be attributed to Foster, not its evaluation of the likelihood of Foster's future testimony. Moreover, none of the authorities the People cite in support of their contention (*People v. Hartsch* (2010) 49 Cal.4th 472, 490, fn. 18; *People v. Ervin* (2000) 22 Cal.4th 48, 68; *People v. Superior Court (Hollenbeck)* (1978) 84 Cal.App.3d 491, 503) come close to suggesting that forfeiture occurred under the circumstances here.

18

(ii) *Good cause*

Turning to the merits, we conclude that Edwards established good cause for an in camera review of Deputy Foster's records. His motion set forth a specific factual scenario of officer misconduct that might or could have occurred, and was plausible when read in light of the pertinent documents. (*Warrick, supra,* 35 Cal.4th at p. 1025; *Uybungco v. Superior Court* (2008) 163 Cal.App.4th 1043, 1049-1050.) Counsel's declaration explained Edwards's own actions in a manner that supported a defense to at least the possession for sale charge. (Cf. *People v. Thompson, supra,* 141 Cal.App.4th at p. 1317.) The police report stated that Edwards admitted selling methamphetamine; that the bag containing the digital scale was his; and that Foster advised Edwards of his *Miranda* rights. Counsel's declaration, in contrast, stated that neither deputy gave Edwards *Miranda* warnings, and Edwards did not admit to Foster that the bag containing the scale was his or that he sold methamphetamine. Counsel's declaration thus provided an internally consistent alternative factual scenario to that presented in the police reports. Edwards challenged the deputies' account of the incident by providing his own version of events, "thereby making the officers' truthfulness material to the issues in the case." (*Brant v. Superior Court* (2003) 108 Cal.App.4th 100, 108; see *Warrick,* at p. 1023 ["By denying the factual assertions made in the police report—that he possessed and discarded the cocaine—defendant established 'a reasonable inference that the [reporting] officer may not have been truthful' "]; *People v. Johnson* (2004) 118 Cal.App.4th 292, 303-304.)

Proof that Foster was untruthful could potentially have assisted the defense. If the jury believed Foster was lying, his credibility could have been impeached. If the trial court hearing the suppression motion concluded Foster obtained incriminating statements from Edwards during a custodial interrogation, but had not advised Edwards of his *Miranda* rights, it would likely have suppressed those statements. (See *Brant v. Superior Court, supra,* 108 Cal.App.4th at pp. 108-109 ["*Pitchess* discovery is appropriate when a defendant seeks information to assist in a motion to suppress"]; *People v. Elizalde* (2015)

19

61 Cal.4th 523, 530-531 [the prosecution may not use inculpatory statements stemming from custodial interrogation unless the suspect was first given *Miranda* advisements].)

The fact that Foster was not the author of the report did not, on the facts presented here, demonstrate a lack of good cause. The trial court was correct that good cause is not established where an officer is not alleged to have committed misconduct. (See *People v. Hill, supra,* 131 Cal.App.4th at pp. 1098-1099.) In the absence of any showing that an officer made or adopted statements contained in a police report authored by another, we agree that they cannot be attributed to him. However, the police report at issue here repeatedly refers to what the officers did as a team, using the pronoun "we." Both Foster and Alanis played a significant role in the detention and arrest. The police report did not indicate it was based solely on Deputy Alanis's observations, and the most logical conclusion is that the report was based in part on Foster's account of events, which he relayed to Alanis. Therefore, Edwards established good cause for an in camera review of Foster's records for complaints related to dishonesty.

(iii) *Harmless error*

A trial court's erroneous denial of a defendant's *Pitchess* motion is not reversible error per se. (*People v. Gaines, supra,* 46 Cal.4th at p. 176; *People v. Moreno, supra,* 192 Cal.App.4th at p. 703.) Instead, "the failure to disclose relevant information in confidential personnel files, like other discovery errors, is reversible only if there is a reasonable probability of a different result had the information been disclosed." (*People v. Gaines, supra,* at p. 176.) Generally, the proper remedy is to conditionally reverse the judgment and remand the matter for an in camera review of the relevant records. (*Id*. at pp. 180-181; *Moreno,* at p. 703.) If no discoverable information exists, or if the defendant fails to establish prejudice, the judgment and sentence are reinstated; if the defendant can establish prejudice, he is entitled to a new trial. (*People v. Gaines, supra,* at pp. 180-183; *People v. Hustead* (1999) 74 Cal.App.4th 410, 419, 422.) However, where the evidence is such that the defendant would be unable to demonstrate prejudice in any event, remand is not required. For example, in *People v. Samuels,*

20

*supra,* 36 Cal.4th 96, the trial court denied the defendant's *Pitchess* motion.  Our Supreme Court held that "even if the trial court erred because defendant made a showing of good cause in support of his request [citation], such error was harmless in light of the extensive evidence linking defendant" to the crimes.  (*Id.* at pp. 109-110; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

Such is the case here.  Had the trial court granted the *Pitchess* motion as to Foster, Edwards would have been entitled to information regarding instances in which Foster had been accused of dishonesty.  The only value of that evidence to the defense would have been to impeach Foster's credibility.  But, given the evidence that was eventually produced at trial, impeachment of Foster would have been of limited utility to the defense.  The undisputed evidence showed Edwards was in possession of a quantity of methamphetamine beyond that which users typically possess.  There was a digital scale in the vehicle, suggesting sales, whether or not Edwards admitted ownership of the container in which it was found.  Edwards did not possess any paraphernalia consistent with personal use of the methamphetamine.  His cellular telephone contained messages that indicated he was dealing methamphetamine.[4]  The foregoing evidence

---

**4**　　In *People v. Diaz* (2011) 51 Cal.4th 84, the California Supreme Court held that the Fourth Amendment did not prohibit police officers from conducting a warrantless search of the text messages on an arrestee's cellular telephone as a search incident to arrest. (*Id.* at p. 88.)  Although the United States Supreme Court denied certiorari in *Diaz* (*Diaz v. California* (2011) 132 S.Ct. 94), after trial in the instant matter concluded it held in *Riley v. California* (2014) __ U.S. __ [134 S.Ct. 2473], that police officers may not search data in an arrestee's cellular telephone absent a warrant or exigent circumstances. (*Id.* at pp. 2493-2494.)  Under *Davis v. United States* (2011) __ U.S. __ [131 S.Ct. 2419], "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." (*Id.* at pp. 2423–2424, 2429; see *People v. Harris* (2015) 234 Cal.App.4th 671, 701.)  The California Supreme Court is currently considering whether *Riley* requires exclusion of evidence obtained during a search of a suspect's cell phone incident to arrest, or whether the search fell within *Davis*'s good faith exception to the exclusionary rule. (*People v. Macabeo* (2014) 229 Cal.App.4th 486, review granted Nov. 25, 2014, S221852.)  Edwards does not raise the issue, and we do not address it.

overwhelmingly demonstrated he possessed the methamphetamine for sale and intended to sell it. It is clear that the jury would have concluded Edwards possessed and transported the methamphetamine, even if it believed Foster had lied about Edwards's statements. (*People v. Watson, supra,* 46 Cal.2d at p. 836*.*) Evidence related to Foster's dishonesty was immaterial to the false personation count. There was undisputed evidence that Edwards gave a false name and admitted doing so to Alanis.

Nor was the court's ruling prejudicial in regard to Edwards's suppression motion. Edwards did not, in his *Pitchess* motion, deny that there was a valid basis for the traffic stop, that he possessed the methamphetamine, or that Foster found it. Edwards did contend Foster failed to advise him of his *Miranda* rights. But the only statement Edwards made after Foster claimed to have *Mirandized* him – and that would have been suppressed -- was that he was selling methamphetamine to make extra money. As we have discussed, the evidence that Edwards transported and possessed methamphetamine for sale was overwhelming, even if his admission is excluded from the picture.

Edwards's *Pitchess* motion also disputed Foster's account that Edwards informed Foster he had smoked marijuana before he was ordered from the vehicle. Even if true, this fact was not grounds for granting the suppression motion. " 'Once a vehicle has been detained in a valid traffic stop, police officers may order the driver and passengers out of the car pending completion of the stop without violating the Fourth Amendment.' " (*People v. Evans* (2011) 200 Cal.App.4th 735, 743; *People v. Lomax* (2010) 49 Cal.4th 530, 564.) Thus, Edwards's statement that he had smoked marijuana earlier was not necessary to justify his removal from the car.

In sum, because Edwards cannot show a reasonable probability of a more favorable outcome had information been disclosed to the defense, the trial court's error was harmless and remand for an in camera review of Deputy Foster's records is not required.

d. *Review of in camera examination of Deputy Alanis's records*

As Edwards requests, we have reviewed the sealed transcript of the in camera hearing conducted on September 19, 2013, at which the trial court reviewed Deputy Alanis's records for complaints related to dishonesty.  The transcript constitutes an adequate record of the trial court's review of any documents provided to it, and reveals no abuse of discretion.  (*People v. Myles* (2012) 53 Cal.4th 1181, 1209; *Alford v. Superior Court, supra,* 29 Cal.4th at p. 1039.)

## DISPOSITION

The judgment is affirmed.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



ALDRICH, J.

We concur:




EDMON, P. J.




JONES, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

23